IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

GLENN R. SMITH,

      **Plaintiff,**

v.                                                  **Civ. No.  13-168 JP/WPL**

SUSANA MARTINEZ, in her individual capacity,
and the STATE OF NEW MEXICO,

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS AND/OR FOR QUALIFIED IMMUNITY (Doc. No. 24) (Motion) seeks dismissal of Plaintiff Glenn R. Smith's (Plaintiff) COMPLAINT FOR VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL RIGHTS, BREACH OF CONTRACT, AND INVERSE CONDEMNATION (Doc. No. 1-1) (Complaint).  The RESPONSE TO DEFENDANTS' MOTION [Doc. 24] FOR SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS AND/OR FOR QUALIFIED IMMUNITY (Doc. 55) (Response) argues that none of Plaintiff's claims are subject to dismissal on grounds of qualified immunity or under Fed. R. Civ. P. 56. Plaintiff also filed the AFFIDAVIT OF GLENN R. SMITH (Doc. No. 56) (Affidavit) in support of the Response.  DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON ALL OF PLAINTNIFF'S CLAIMS AND/OR FOR QUALIFIED IMMUNITY (Doc. No. 67) (Reply), asserts there are no genuine issues of material fact in dispute and that Defendants are entitled to summary judgment on all of Plaintiff's claims.

1

The Court carefully considered the pertinent law, pleadings, attachments, and argument by counsel at a hearing on December 19, 2013.[1]  (Doc. No. 62, Minutes.)  Because there are no genuine issues of material fact, Defendants are entitled to judgment as a matter of law on all claims, and Defendant Susana Martinez is protected by qualified immunity on three of Plaintiff's claims.

## SUMMARY OF CLAIMS AND MOTION

Plaintiff, a Democrat, sues Governor Susana Martinez, a Republican, in her individual capacity only, and the State of New Mexico.  Plaintiff alleges that Governor Martinez wrongfully terminated him as the Director of the Workers' Compensation Administration (WCA).  He further asserts that when Governor Martinez was elected in late 2010, she discharged Plaintiff from his position as of January 1, 2011, one year short of his statutory five-year term, based on his political affiliation and his exercise of free speech.  Plaintiff brings claims against Governor Martinez (1) for violating Plaintiff's constitutional rights of freedom of speech, freedom of association, and freedom of affiliation and non-affiliation and for impermissibly retaliating against him based on his exercise of those freedoms; (2) for denying Plaintiff procedural due process with respect to the deprivation of his liberty and property rights; and (3) for causing an unconstitutional taking of Plaintiff's protected rights.  (Complaint, Counts I-III.)  Plaintiff sets forth an alternative inverse condemnation claim against Governor Martinez and the State of New Mexico and a breach of contract claim against the State.  (Complaint, Counts IV-V.)

Defendants' Motion argues, in part, that because Plaintiff was an exempt, at-will employee, and Governor Martinez had express constitutional authority to remove him, they are

---

[1] The Court did not consider exhibits attached to Defendants' Reply (Doc. No. 67).  Thus, it granted Plaintiff's motion to strike exhibits (Doc. No. 73).  ORDER GRANTING PLAINTIFF'S MOTION TO STRIKE.  (Doc. No. 75.)

entitled to summary judgment on Counts I and V.  Defendants also contend that Governor

Martinez is entitled to qualified immunity on Counts I, II, and III that assert individual capacity

claims.  In addition, Defendants maintain that Plaintiff does not have a protected property

interest in his position as WCA Director for purposes of Count II, the due process claim, or

Count III, the Takings Clause claim.  Defendants further urge that there is no basis to support

Count IV, the inverse condemnation claim.  Thus, Defendants seek dismissal of Plaintiff's

Complaint in its entirety.

## BACKGROUND

On about January 2, 2007, then Governor Bill Richardson, a Democrat, appointed

Plaintiff as WCA Director.  The pertinent New Mexico statute provides that the WCA will be "in

the charge of a director, who shall be appointed by the governor for a term of five years with the

consent of the senate."  NMSA 1978 § 52-5-2(A).  The statute further states that the director

shall continue to serve, upon the expiration of the five-year term, until the successor is appointed

and qualified.

Section 52-5-2(A), unlike other New Mexico statutes governing the appointment of

cabinet secretaries, does not contain language that the WCA Director serves "at the pleasure of

the governor."  *See* Response at 12, ¶ 13.  However, on January 16, 2007, Governor Richardson

submitted a "Senate Executive Message" to the President Pro Tempore of the New Mexico

Senate, requesting that Plaintiff be appointed as WCA Director, "for a term commencing January

1, 2007 and to be served at the pleasure of the Governor."  (Response, Ex. N.)  Plaintiff

represents that Governor Richardson "never had that discussion" with him.  (Affidavit, ¶ 19.)

Plaintiff actively supported Bill Richardson for the Democratic Party's presidential nomination in the 2008 election and worked on his campaign.  In 2010, Plaintiff actively supported Governor Martinez's opponent in the primary and general gubernatorial elections.

Plaintiff has been an attorney since 1987.  He worked for the Attorney General of the State of New Mexico, first as special counsel and then as Deputy Attorney General.  Before accepting the WCA Director position, Plaintiff was offered various positions, including general counsel positions with different New Mexico state agencies and head of the Risk Management Division.  Plaintiff accepted the position of WCA Director based, in part, on his reliance on the statutory five-year term of employment.

On January 2, 2007, Plaintiff began his job of WCA Director.  He was a full-time public employee of the State, was salaried, received benefits, and was a member of the Statewide Human Resources, Accounting and Financial Management Reporting System.  (Response, ¶ 6.) The WCA Director is not part of the State's executive department and is not a cabinet secretary. (*Id.*)[2]

The State Senate confirmed Plaintiff's appointment during the 2007 regular session of the New Mexico State Legislature.  Plaintiff expected to serve the full five-term as WCA Director and work until at least January 2012.

On June 11, 2010, several years into his five-year term, Plaintiff signed an "Acknowledgement of Policies for the Governor Exempt Employees Updated June 1, 2010"

---

[2] "The Executive Reorganization Act creates an executive cabinet headed by the governor and a cabinet department structure.  [NMSA §§] 9-1-3, –4. The principal unit of the executive branch is a 'cabinet department' headed by a 'secretary' who is appointed by the governor.  [§§] 9–1–2, –3(A), (B)(1). Among several express duties of the secretaries, who are executive cabinet members, are the specific duties to 'advise the governor on problems of state government[,]' to 'recommend methods of interagency cooperation[,]' and to 'assist the governor in defining policies and programs to make the government responsive to the needs of the people.'"  [§§] 9-1-3(A), (B)(1), (4), (7).  *New Mexico Dep't. of Workforce Solutions v. Perez*, --- P.3d ----, 2013 WL 6631927, *3 (Ct. App. Dec. 12, 2013).

(Acknowledgement).  (Motion, Ex. 1.)  The Acknowledgement states that Plaintiff was given a

copy of the updated "Policies for the Governor Exempt Employees" (Policies).  The Policies

represent, in part, that two New Mexico statutes (§§ 10-9-4 and 10-9-5 of the Personnel Act)

work together to determine which state employees the Policies will cover.  Section 10-9-4(B), for

example, excludes heads of agencies appointed by the governor, from coverage by the Personnel

Act.

Plaintiff, as WCA Director, is an exempt employee.[3]  (Response, ¶ 29.)  The introduction

to the Policies states that "nothing in this policy or in any other materials or information . . .

creates a contract of employment between an employee and the State of New Mexico."  (Motion,

Ex. 2.)  The Policy's introduction expressly indicates in bold print that "Exempt employment is

on an at-will basis."  (*Id.*)  "No statements to the contrary, written or oral, either made before or

during an individual's employment, will modify the at-will status of exempt employees."  (*Id.*)

Near the end of 2010, Governor Martinez won the gubernatorial election.  In late 2010,

Plaintiff and the Governor's transition team exchanged several e-mail communications or

memoranda.  Plaintiff received a November 19, 2010 memo to "New Mexico Exempt

Employees" stating that "[t]he Governor-elect has made clear that current employees are

welcome to apply for jobs in the new administration.  She is looking for highly-qualified people

of character who share her vision for the State of New Mexico."  (Affidavit, ¶ 26.)  Plaintiff

believed he received this memo in error as it stated that "[w]ith the exception of those

specifically asked and approved to stay on, exempt employees *who serve at the pleasure of the*

---

[3] In December 31, 2010 correspondence from Plaintiff's attorney to the Governor's transition team,
Plaintiff's attorney stated that Plaintiff was "not an exempt employee, but an employee with a statutory
five year term."  (Affidavit, Ex. H.)  However, in the Response, Plaintiff agrees that he signed forms
indicating he was an exempt employee, although he argues that this does not mean his employment for a
term was "at-will."  (Response, ¶ 29.)

*Governor* are expected to submit their letters of resignation to the Governor who appointed them effective December 31, 2010." (*Id.*, ¶¶ 28, 29) (emphasis added).

During November and December 2010, Plaintiff sent several communications to the Governor's transition team informing the team and the Governor-elect that he intended to continue working through his five-year term until early 2012. (*Id.*, ¶¶ 24, 25, 34.) Plaintiff did not always receive written responses from the transition team. (*Id.*, ¶¶ 31, 33, 38, 39.)

On about December 27, 2010, Plaintiff received an email from the New Mexico Department of Finance and Administration, addressed to him, workers' compensation judges, WCA general counsel, and the WCA deputy director, asking all recipients to read an attached memo, dated December 22, 2010, from the governor's transition team. The memo stated that "[a]s exempt employees of these agencies, we would like you to continue your employment after January 1st [2011]" and that the team was not requesting these employees' resignations at this time. The memo further provided: "This letter does not alter or change your status as an exempt and 'at-will' employee." (*Id.*, ¶¶ 40, 41.) The memo advised that the transition team was in the process of reviewing the boards or commissions for which the employees worked and that there could be personnel changes.

Plaintiff received a memo, dated December 30, 2010, thanking exempt employees for their service and requesting resignations "of all Governor-exempt employees by December 31st [2010]." (*Id.*, ¶ 23.) The memo stated that if an exempt employee did not submit a resignation, "your exempt position is terminated effective January 1st [2011]." (*Id.*) Plaintiff did not voluntarily resign. However, based on communications between his attorney and the Governor's Chief of Staff, Plaintiff understood it was Governor Martinez's intention to terminate his

employment as WCA Director and that he was not to appear for work on January 3, 2011.  (*Id.*, ¶ 45.)  Thus, Plaintiff did not go to work as scheduled on January 3, 2011.

Plaintiff satisfactorily fulfilled his duties as WCA Director from January 2, 2007 until December 31, 2010, at which time he contends he was wrongfully terminated.  On January 1, 2011, Governor Martinez began her term.  In January, 2011,[4] Plaintiff filed a Petition for Writ of Mandamus (Petition) in the New Mexico Supreme Court, asking the Supreme Court to prohibit Governor Martinez from removing him from his position before the expiration of the five-year term.  (Affidavit, ¶ 47.)  On January 21, 2011, a news reporter asked the Governor's Office for a comment on Plaintiff's Petition.  (*Id.*, Ex. I.)  A representative of the Governor's Office responded by stating that "Governor Martinez asked for the resignation of all political appointees from the previous administration, and that includes Mr. Smith.  Statute does not expressly limit the Governor's constitutional authority to remove him from his position."  (*Id.*)  On February 17, 2011, the New Mexico Supreme Court dismissed or denied Plaintiff's Petition without discussion.  (Motion at 1-2; Response at 25-26.)

In a January 2011 personnel/position action request form, no reason was given in the designated blank for Plaintiff's "termination," although the form stated that a reason was required. (Affidavit, Ex. J.)  Plaintiff was granted unemployment benefits, and the notice of the claim determination advised that Smith "was laid off due to lack of work," and, therefore, was not subject to disqualification for benefits.  (*Id.*, Ex. L.)

---

[4] The Court asked counsel to supply it with a copy of the Petition and the New Mexico Supreme Court's Order denying or dismissing  the Petition.  (Doc. No. 62, Minutes.)  However, copies have not been provided, and the Court cannot refer to the exact dates or contents of the pleadings.

On February 1, 2011, Governor Martinez appointed Ned Fuller, a Republican, as WCA Director.  Fuller's appointment letter stated that his term commenced February 1, 2011 and would expire February 1, 2016.  (*Id.*, Ex. K.)

Article V, section 5 of the New Mexico Constitution states that "[t]he governor shall nominate and, by and with the consent of the senate, appoint all officers whose appointment or election is not otherwise provided for and may remove any officer appointed by [her] unless otherwise provided by law."  This provision further provides that if a vacancy occurs in any state office, "the governor shall fill such office by appointment, and such appointee shall hold office until the next general election, when his successor shall be chosen for the unexpired term."  N.M. Const. art. V, § 5.

## DISCUSSION

### A.  <u>Summary Judgment Standard</u>

Rule 56 directs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting that a fact is or cannot be genuinely disputed must support such assertion by "citing to particular parts of materials in the record," including affidavits, or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  In evaluating a request for summary judgment, the Court construes the non-movant's evidence as true, and all justifiable and reasonable inferences are drawn in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The summary judgment procedure is "not . . . a disfavored procedural shortcut, but rather [is] an integral part of the Federal Rules as a whole, which are designed 'to secure the just,

speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). To defeat summary judgment, the non-moving party must come forward with more than a showing of the "existence of a scintilla of evidence in support of the plaintiff's position;" "there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. However, "[a]t the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir.1995) (citation omitted).

### 1.      First Amendment Claim

Plaintiff alleges that Governor Martinez violated his constitutional rights of freedom of speech, freedom of association, and freedom of affiliation and non-affiliation, and that she retaliated against him based on his exercise of those freedoms.[5] (Complaint; Response at 2.) The "First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation, unless their work requires political allegiance." *Snyder v. City of Moab*, 354 F.3d 1179, 1184-85 (10th Cir. 2003) (*citing Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1451 (10th Cir. 1997)). An employer violates this constitutional protection if it removes a public employee because of his position regarding a particular candidate for office unless the public employee serves in a position requiring political allegiance. *Snyder*, 354 F.3d at 1184-85.

---

[5]Plaintiff characterizes this claim as violations of his freedom of speech and freedom of affiliation/non-affiliation. However, the Court analyzes it as one involving affiliation or non-affiliation. This is not a case where Plaintiff asserts that specific "speech" involved a matter of concern or that his interest in "commenting upon matters of public concern" were greater than the employer's interest in promoting the efficiency of public services. *See, e.g., Ballard v. Muskogee Reg'l Med. Ctr.*, 238 F.3d 1250, 1252 (10th Cir. 2001) (reciting elements of First Amendment speech claim). Instead, the claim concerns allegations of Plaintiff's rights of political beliefs, affiliation, or non-affiliation.

The Tenth Circuit Court explained:

> . . . if the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved, then no First Amendment violation occurs, if the employee is fired on the basis of his or her political allegiance. *Branti v. Finkel*, 445 U.S. 507, 518 (1980). Whether political association is an appropriate requirement for a position has been held to be a question of fact. However, that question may be resolved as a matter of law if the facts as to the nature of the duties of the position are undisputed. *Barker v. City of Del City,* 215 F.3d 1134, 1138 (10th Cir. 2000). The employer . . . bears the burden of proving whether political association is an appropriate requirement for the effective performance of the public office involved. *Id.*

*Id.* at 1185 (internal quotation marks omitted). The question of whether political allegiance is an appropriate requirement for job performance depends on the "nature of the employee's duties and responsibilities." *Id.* (citation omitted). The Court looks at the "whole picture," rather than any one specific factor or duty. "The nature of the responsibilities [of the job] is critical." *Id.* (*citing Elrod v. Burns*, 427 U.S. 347, 367 (1976) (plurality opinion)). When an employee's job responsibilities are not well-defined or are broad in scope, the job is more likely to be a policymaking position. The formulation of plans to implement broad goals might constitute duties that require political allegiance or loyalty. *Id.*

In *Snyder*, the question of whether the effective performance of the public office of city treasurer required political loyalty went to a jury that found in favor of the defendants mayor and city. The Tenth Circuit Court affirmed, concluding that the record contained sufficient evidence indicating that the city treasurer job involved significant amounts of policymaking. *Id.* at 1186.

In *Poindexter v. Bd. of County Comm'rs*, 548 F.3d 916 (10th Cir. 2008), the Court affirmed summary judgment in favor of the employer on a similar First Amendment claim involving speech and political association. In that case, Huff, the defendant commissioner,

10

demoted Poindexter, a road foreman and replaced him with one of Huff's political supporters.

Prior to his demotion, Poindexter declined to support Huff, briefly ran against Huff for the

commission seat, and worked for opponents of Huff in the primary and general elections. *Id.* at

918. The district court granted summary judgment in favor of defendants, finding, in part, that

the road foreman job appropriately required political loyalty. *Id.*

In affirming the district court, the Tenth Circuit Court set forth the following reasoning

and two-part test:

> The Supreme Court has held that many public employees have the
> right, with certain limitations, to engage in political activities
> opposed to their elected superiors without penalty to their jobs.
> Recognizing, however, that democratic governance requires that
> the voters be able to influence the conduct and the selection of
> policy-making and politically significant officials-to "throw the
> rascals out" – the Court has held that political loyalty "is an
> appropriate requirement for the effective performance" of some
> government positions. The two-part test laid out in *Elrod* and
> further refined in *Branti* determines whether a government
> employee's demotion violates his right to free political association.
> To survive summary judgment, an employee needs to show a
> "genuine dispute of fact that (1) political affiliation and/or beliefs
> were 'substantial' or 'motivating' factors" in his demotion, and (2)
> his position did not require political allegiance.

*Id.* at 919 (internal citations omitted). In *Poindexter*, the parties disputed the question of

motivation for the demotion, but the Court observed that the plaintiff had to raise genuine issues

of material fact with respect to both parts of the inquiry. The district court determined that the

job description and duties performed were undisputed, and that the job required political

allegiance. The Tenth Circuit Court reasoned that "a reasonable jury would be forced to

conclude that the office of Road Foreman has a significant political dimension and sufficient

discretionary authority that the County Commissioner, for whom the Foreman works, may

properly take political loyalty into account. *Id.* at 920, 923-24.

11

In *Flynn v. City of Boston*, 140 F.3d 42, 44-46 (1st Cir.), *cert. denied*, 525 U.S. 961 (1998), the First Circuit Court of Appeals provided historical perspective on political patronage law in holding that neither an associate director of administration and finance nor an associate director for field operations was protected from political patronage terminations.

> From the outset of the Republic, government jobs have gone by political patronage, tempered now by civil service laws that afford varying degrees of protection, especially to lower level employees. To this accommodation, the Supreme Court about 25 years ago brought a new constitutional principle: that political firings by the government are allowed only in those jobs for which political loyalty is an "appropriate" criterion.

> In response, the lower federal courts have tried to develop doctrine, but it is largely a porridge of general statements and variables: positions are less likely to be protected to the extent that they are "higher," more "political," more "confidential," and so on; duties prevail over titles; everything depends on circumstances. . . .

> . . . .

> Thus, [the First Circuit Court has] upheld political discharges of the regional director of an administrative agency, the municipal secretary in a mayor's office, an officer in charge of human resources, a director of public relations, a superintendent of public works, a director of a city's federal programs office, and a director of a satellite office of the Massachusetts Secretary of State . . . . Just one decision provisionally protected an official with a high-sounding title, but her duties were essentially technical.

> By contrast, this court has disallowed political firings for a cleaning supervisor, a career employee administrative aide, and an auditor of books and records. The Supreme Court cases, granting or looking toward protection, have involved a floor supervisor, a guard, a process server, an assistant public defender, a rehabilitation counselor, a road equipment operator, a garage worker, and a dietary manager. Thus, it is primarily low-level jobs that have been protected, although this encompasses most workers in most agencies of government.

> . . . .

12

One might ask why anyone, apart from elected officials, should be subject to "political" firing. The answer – this is folk wisdom, not mathematical proof – is that to implement their mandates, elected officials need a cadre of agency leaders and top subordinates responsive to the elected officials' goals. A rule effectively preventing the replacement of senior officials by new administrations would be a very serious step. A legislature can provide such tenure, but the Constitution does not command it.

### a. *Motivating Factor:*

The parties disagree whether Plaintiff's political affiliation or beliefs were "substantial" or "motivating factors" in Governor Martinez's decision to remove him as WCA Director. However, in construing the evidence in the light most favorable to Plaintiff, the Court concludes that Plaintiff raised a genuine issue of material fact as to whether his party affiliation was a motivating factor in Governor Martinez's decision to remove him. For example, there is evidence of the parties' different political affiliations, the timing of the removal decision coinciding with Governor Martinez's election, the lack of any reason provided for Plaintiff's termination on the personnel action form, and the determination to grant Plaintiff unemployment benefits based on an inconsistent note that Plaintiff was "laid off due to lack of work." Moreover, Plaintiff testified he was performing satisfactorily, and no evidence was presented to the contrary. The evidence also includes an email from the Governor's Office stating Governor Martinez asked for the resignation of "all political appointees from the prior administration." [6]

---

[6] Generally, a party must come forward with admissible evidence on summary judgment. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005) (the substance of the evidence submitted at summary judgment must be admissible at trial). While Plaintiff asserts in his affidavit that Governor Martinez "issued a statement" (Affidavit, ¶ 47, Ex. I), the email statement appears to be made by an employee of the governor and is unauthenticated. However, Defendants admitted that the Governor's office issued a statement that Governor Martinez requested the resignation of political appointees from the previous administration, including Plaintiff. (Reply at 8, ¶ 9.)

### b.    *Political Allegiance:*

The Court next evaluates whether Plaintiff raised a genuine issue of material fact

sufficient to defeat summary judgment regarding whether the WCA Director position necessarily

requires political allegiance.  As discussed below, the Court finds that Plaintiff did not raise a

genuine issue of fact for trial with respect to this prong.  In other words, the Court concludes that

it is undisputed that the position of WCA Director necessarily requires political allegiance.[7]

### i.    *Description of the WCA and the WCA Director Duties:*

The WCA is an entity of state government.  NMSA 1978 § 52-5-1.2.  The WCA is "in

the charge" of the Director.  § 52-5-2(A).  The Director is appointed on the "basis of

administrative ability, education, training and experience relevant to the duties of the director."

§ 52-5-2(A).  The appointing statute, § 52-5-2(A), requires that the Director appoint "necessary

workers' compensation judges" and review those judges' performance, § 52-5-2(B).  The

Director may approve reappointment of a workers' compensation judge for a subsequent period.

§ 52-5-2(B).  Should there be complaints about workers' compensation judges, the WCA

Director reviews the State Personnel Board's findings concerning such complaints.  § 52-5-2(C).

The appointing statute expressly provides that workers' compensation judges can be terminated

before the expiration of their term of employment for specific reasons.  There is no similar

provision in the appointing statute addressing reasons the WCA Director can be terminated.

The State Legislature set forth the WCA Director's jobs and responsibilities in numerous

statutory provisions.  The Court summarizes some of those duties in this Memorandum Opinion

---

[7] Plaintiff was allowed limited discovery to respond to the summary judgment motion based on qualified immunity.  However, Plaintiff came forward with a lengthy affidavit and exhibits regarding his position, and provided numerous citations to statutory authority regarding his job duties.  Moreover, Plaintiff is in the best position to know his job responsibilities.  Thus, there is ample evidence of record on this question without the need for additional discovery.

and Order but also provides an attached appendix with more detailed descriptions of the WCA Director's job duties.  (*See* Appendix, attached.)

        ii.        *Analysis of WCA Director's Job Position and Duties:*

      In analyzing Plaintiff's First Amendment claim, the Court accepts as true the statutory descriptions, Plaintiff's contention that he was not a cabinet secretary, and his assertion that the duties of the WCA Director were, in some instances, quasi-judicial in nature.  Also, the New Mexico statutes do not refer to the WCA Director as being part of the executive arm of government.  Clearly, however, the WCA is not part of the judiciary system.  *Carrillo v. Compusys, Inc.*, 122 N.M. 720, 722 (Ct. App.), *cert. denied*, 122 N.M. 589 (1997) (WCA is "not part of the judiciary; appeals are taken from decisions of the [workers' compensation judges] *to* the judiciary[;]" WCA created "to provide an administrative system for quasi-judicial adjudication of disputes arising from job-related injuries") (emphasis in original).

      Notwithstanding these facts and Plaintiff's argument that his position and the WCA are independent from the executive branch, there is no dispute that Plaintiff, as Director, was charged with the administration of the WCA.  As head of an agency, he was responsible for the WCA and application of the New Mexico Occupational Disease Disablement Law.  In addition, the first requirement listed for the WCA Director position is "administrative ability."   Although not a cabinet director, without doubt Plaintiff was a high-level state government administrator.

      As top official of the WCA, Plaintiff had supervisory power, including the authority to hire workers' compensation judges and review their performance.  § 52-5-2(B).  In the WCA Director position, Plaintiff was tasked with a number of administrative or policymaking functions:  these included issuing certificates that excused some employers from obtaining insurance coverage; establishing regulations for procedures to review, renew, and revoke any

certificate excusing employers from filing a certificate of insurance; deciding to destroy

insurance policies, certificates, bonds, or undertakings; determining the adequacy and structure

of annual safety inspections; establishing procedures for self-inspections; authorizing payments

to specific persons; and approving the use of independent adjusting companies.  (*See also*

*Appendix*.)

In addition, the WCA Director investigates allegations of unfair claim-processing

practices, adopts regulations to define unfair claim-processing practices, prepares and approves

specific workers' compensation forms, adopts rules and regulations governing forms to be used

in specific instances, approves forms to be used for reporting accidental injuries or occupational

diseases, and provides reports to agencies regarding injured workers' identities.  Of particular

significance, § 52-1-68 empowers the WCA Director to promulgate special and general

regulations, subject to the approval of the governor, to enter into specific agreements with

boards, commissions and agencies of other states.  (*See Appendix*.)  Thus, contrary to Plaintiff's

position that the WCA Director's role "requires independence from any interference by the

governor[,]" (Response at 12, ¶ 10), this statutory provision explicitly requires the WCA Director

to act in conjunction with the governor.

The WCA Director also *establishes* an ombudsman program and designates qualified

employees as ombudsmen.  § 52-5-1.4(A).  He does not merely mediate disputes in this role as

argued by Plaintiff.  (Response at 11.)  Instead, in his administrative and policymaking role, the

WCA Director gathers data and conducts studies to evaluate workers' compensation and

occupational disease disablement systems.  He evaluates benefits structure and costs, establishes

baseline data against which to assess changes in the law, and assesses insurance industry data

pertaining to workers' compensation and occupational disease disablement claims and payments.

16

(*See Appendix.*)  In addition, the WCA Director prepares annual reports and publishes specific information, adopts rules and regulations to determine the necessary qualifications to be a self insurer, and monitors accident or disablement and payment reports.

The administrative and policymaking functions of the WCA Director far outweigh his quasi-judicial tasks.  These are not "essentially technical" duties or duties that might evince low-level jobs that do not implicate policy.  *See Flynn*, 140 F.3d at 44-46 (distinguishing job with essentially technical duties from higher level positions).

Moreover, Plaintiff's argument that he functions "like a court administrator, although with more authority" supports a finding that the WCA Director's job is largely or primarily managerial in nature.  Further, the fact that Plaintiff likens the "type and organization" of the WCA to that of "district courts," does not make the WCA an arm of the judiciary especially in view of clear authority to the contrary.  *See Carrillo*, 122 N.M. at 722 (WCA is not part of the judiciary and is an administrative system).

The Court concludes that undisputed facts demonstrate that the majority of the WCA Director's duties are administrative, executive, and policymaking functions and tasks.  (*See Appendix.*)  The WCA Director has numerous executive obligations and substantial discretion to make decisions concerning the Workers' Compensation Act ("the Act").  Significantly, the WCA Director analyzes data to determine the need for changes in law.  Indeed, Plaintiff's email to the Governor's Office, dated November 30, 2010, confirms his role in working with proposed legislation to amend the Act.  (Affidavit, Ex. C.)

The Court concludes that the WCA Director "has a significant political dimension and sufficient discretionary authority," such that Governor Martinez, the appointing authority, could properly take political loyalty into account.  *See Snyder*, 354 F.3d at 1186 (*citing Barker*, 215

17

F.3d at 1138) (record and evidence supported the jury's finding that political loyalty "[was] an appropriate requirement for the effective performance of the public office involved").  In other words, a state agency director with policymaking authority, involvement in legislation related to the Act, and significant managerial duties, is the type of position that calls for "political loyalty of employees . . . to the end that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate[.]"  *See Green v. Henley*, 924 F.2d 185, 186 (10th Cir. 1991) (citation omitted).  *See also Flynn*, 140 F.3d at 45 (the major responsibilities of associate director of administration and finance "meant that policy disagreements with his politically appointed supervisor could lead to less effective implementation of political goals").  The WCA Director, directly or indirectly, has "meaningful input into government decisionmaking" on issues where there might be principled disagreement.  *See Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981) ("The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation."), *cert. denied*, 455 U.S. 1021 (1982).

Under these circumstances, party affiliation is an appropriate requirement for the effective performance of the high-level office of WCA Director, and political patronage is a valid reason to remove the WCA Director from his position.  After considering the "whole picture" in relation to the WCA Director's position, job description, and duties, the Court finds no significant factual disputes to preclude summary judgment.  Accordingly, summary judgment will be granted to Defendants on the First Amendment claim (Count I).

### 2.     Due Process and Taking Claims

In Counts II and III, Plaintiff alleges that Governor Martinez intentionally deprived him of property rights without required procedural safeguards and without just compensation. (Complaint; Response at 2.)  Both of these claims depend on Plaintiff presenting evidence that he had a protected property interest in his position of WCA Director.  *See Hyde Park Co. v. Santa Fe City Council,* 226 F.3d 1207, 1210 (10th Cir. 2000) ("to prevail on either a procedural or substantive due process claim, a plaintiff must first establish that a defendant's actions deprived plaintiff of a protectable property interest") (citations omitted); *E. Spire Commc'ns, Inc. v. Baca,* 269 F. Supp. 2d 1310, 1325 (D.N.M. 2003) (to prevail on a takings claim, a plaintiff must establish a protected property interest is involved and that the governmental action is a taking without just compensation) (citation omitted), *aff'd*, 392 F.3d 1204 (10th Cir. 2004).

The New Mexico Supreme Court has held that "property" under the Fourteenth Amendment includes government benefits such as public employment.  *Lovato v. City of Albuquerque*, 106 N.M. 287, 289-90 (1987) (*citing Bishop v. Wood*, 426 U.S. 341, 344 (1976); *Bd. of Regents v. Roth*, 408 U.S. 564, 576–78 (1972)).  If a plaintiff proves he has a property interest in his employment, a state cannot deprive him of that interest without due process. *Snyder*, 354 F.3d at 1189 (citation omitted).  However, under New Mexico law, a public employee has a protected property interest only if he has an express or implied right to continued employment.  *Lovato*, 106 N.M. at 289-90.  It is not enough to have a unilateral expectation of continued employment; instead, a plaintiff must establish that he had a "legitimate claim of entitlement" to employment.  *Roth*, 408 U.S. at 577.

"Property interests are not created by the Constitution, but arise from independent sources such as state statutes, local ordinances, established rules, or mutually explicit

understandings." *Snyder*, 354 F.3d at 1189 (*citing Dickeson v. Quarberg*, 844 F.2d 1435, 1441 (10th Cir. 1988)).  This is not a case where Plaintiff alleges the existence of a written employment agreement, *i.e.,* a separate written document negotiated by Plaintiff and his employer that provides promises regarding the tenure and expectations of his employment. There is no such document or writing.  Nor does Plaintiff allege that an implied contract of employment arose between him and the State of New Mexico, based on verbal promises made to him, written policies, handbook or employment manual representations, custom or course of conduct between the parties, or specific rules and regulations.  *See, e.g., Orion Technical Res., LLC v. Los Alamos Nat. Sec., LLC*, 287 P.3d 967, 971-72 (Ct. App. 2012) (discussing examples of implied-in-fact contracts).

Plaintiff's property right claims (due process and takings clause) depend on the New Mexico statute authorizing the governor to appoint the WCA Director to a five-year term. § 52-5-2(A).  Plaintiff argues that this "definite statutory term" of employment is a contract or "takes the employment contract out of the 'at will' doctrine that allows an employer to discharge an employee for no reason" and at any time.  (Response at 20.)  In support, Plaintiff relies on various New Mexico decisions for the proposition that "employment without a definite term is presumed to be at will."  (*Id.*) (citations omitted).

In those cases, the New Mexico courts set forth the general principle that employment without a definite term is presumed to be at will.  *See, e.g., Trujillo v. N. Rio Arriba Elec. Coop., Inc.*, 131 N.M. 607, 615 (2002).  At will employment means that either an employer or employee can terminate the employment relationship for any reason or no reason and at any time.  *Id.*  An exception to the at will presumption in New Mexico is the existence of an implied contract.  *Id.*

None of the New Mexico cases cited by Plaintiff support his position that the statutory term of employment creates a protected property interest.  Instead, each of those cases analyzes whether an implied contract limited the employer's right to discharge the employee and whether the employer breached an implied contract.

Further, only one case relied on by Plaintiff concerns an employee with a statutory term of employment.  But, it does nothing to decide the question before the Court.  *See Denish v. Johnson*, 121 N.M. 280 (1996) (discussing whether vacancy occurs in appointed office when appointee leaves office before completion of constitutional or statutory term).  *See also Pollack v. Montoya*, 55 N.M. 390 (1951) (deciding whether chief of liquor control division was a state officer); *Beggs v. City of Portales*, 146 N.M. 372 (2009) (determining if implied contract arose based on policies, manuals and ordinances).

The key question in determining if Plaintiff had a protected property interest is whether he had a "*legitimate* claim of entitlement" to serving the full five-year term of employment as set forth by § 52-5-2(A).  *See Roth*, 408 U.S. at 577 (emphasis added).  This inquiry requires an examination of the statutory language, the constitutional authority for the governor's removal power, and related New Mexico case law.

The appointing statute, § 52-5-2(A) contains no express limitations on a governor's power to remove the WCA Director before the expiration of the five-year term.  Clearly, the legislature could have limited the governor's removal power by requiring, for example, evidence of certain types of malfeasance or unsatisfactory job performance.  However, it did not provide any such restrictions.  Moreover, in contrast, the legislature did limit the WCA Director's authority to remove a workers' compensation judge by stating that the violation of any canon of the judicial code of conduct was the "exclusive grounds for dismissal prior to the expiration of

his [employment] term."  § 52-5-2(C).  The legislature's failure to limit the governor's removal power weighs against finding that Plaintiff had a "legitimate" claim or expectation of entitlement to serve the full five-year term.

In addition, article V, section 5 of the New Mexico Constitution specifically authorizes the governor to make appointments and to "remove any officer appointed by him unless otherwise provided by law."  Plaintiff asserts that the five-year term set forth in § 52-5-2(A) is the law that limits the governor's removal authority.

New Mexico case law contradicts Plaintiff's position.  In *State ex rel. Ulrick v. Sanchez*, 32 N.M. 265, 255 P.2d 1077 (1926), appellants unsuccessfully argued that the governor did not have the power to remove officers he appointed who required consent of the Senate, and that the governor could not remove a public officer without notice and hearing specifying the reasons constituting cause for removal.  *Id.* at 1078.  At that time, section 5 of article 5 of the Constitution restricted the governor's removal power by allowing removal for "incompetence, neglect of duty, or malfeasance in office."  *Id.* at 1079.

The New Mexico Supreme Court determined that the governor could remove the officers he appointed.  *Id.*  The Court further decided that a public office job was not property and that there was not a vested right to hold the office.  *Id.* at 1087.  The Court reasoned that the constitutional convention had the power to limit removal authority and yet, neither the constitution nor the pertinent statute required notice or hearing before removal of an officer.  The Court concluded, in part, that "[i]t was the intention of the constitutional convention when framing the Constitution, and the people when adopting it, that the Governor might remove the officers appointed by him without notice or hearing."  *Id.*

The *Ulrick* decision supports a conclusion that the governor's power to remove appointees like the WCA Director is broad.  The decision also indicates that the current version of the New Mexico Constitution, that does not contain the earlier limitations on the governor's removal power, gives even more expansive removal authority.  The state could have and at one time did limit the governor's removal power but later broadened that power.

In *State v. Anaya*, 102 N.M. 609 (1985), the New Mexico Supreme Court held that mandamus did not lie against the governor concerning his removal powers and that due process was not required before removal of the State Board of Barber Examiners.  In *Anaya*, the governor removed the examiners before their stated terms of employment expired.  The New Mexico Supreme Court again reviewed article V, section 5 of the state constitution that contained the same limitation on the governor's removal power in effect at the time it decided *Ulrick*.  It also examined a state statute containing similar limitations on removal.  In reliance on its earlier holding in *Ulrick*, the *Anaya* Court found no notice or hearing was required before removal of the examiners.  *Id.* at 611-12.

The *Anaya* petitioner-appellants also argued that the statutory scheme created a protected property interest that entitled them to notice and hearing before termination.  The New Mexico Court rejected this argument, observing that the examiners were policymaking persons and that a policymaking public servant had no property interest in his position.  *Id.* at 612.  In reaching its decision, the New Mexico Supreme Court further observed that the examiners, along with members of boards, and heads of agencies appointed by the governor, were exempt from coverage under the Personnel Act.  *Id.*  Indeed, here, Plaintiff concedes he is an exempt employee and that as such, the New Mexico Personnel Act does not apply to him.  *See Mitchell v. King*, 537 F.2d 385, 391 (10th Cir. 1976) (applying New Mexico law) (heads of agencies

appointed by the governor are not entitled to the State Personnel Act's notice and hearing requirements before their dismissal).

Like *Ulrick*, the *Anaya* decision supports a finding that Plaintiff did not have a property interest in his job or a legitimate expectation to continued employment throughout his five-year term.  Furthermore, consistent with *Ulrick* and *Anaya*, Plaintiff was not entitled to notice or a hearing before removal.

In *State v. Espinosa*, 134 N.M. 59 (2003), the New Mexico Supreme Court held that the governor's removal power included the right to remove lay members of the Judicial Standards Commission.  The commission members, who were appointed by the governor for five-year staggered terms, sought to stop Governor Bill Richardson from removing them and replacing them with new gubernatorial appointees.  The New Mexico Supreme Court noted that shortly after the governor took office in January 2003, he began removing executive officers, state employees and board members and replacing them with his own appointees.  *Id.* at 60.  He took those actions in accordance with article V, section 5 of the state constitution which, as of 2003, was limited only by the present language, "unless otherwise provided by law."

In reaching its decision, the *Espinosa* Court explained:

> Both *Ulrick* and [*Anaya*] dealt with executive officers, rather than appointees who in fact serve under the judiciary.  Nonetheless, those cases indicate that the Governor has plenary authority to remove his appointees unless the Legislature has imposed an express limit on that power.  In 1988, the voters . . . broadened the Governor's authority, eliminating the requirement that the Governor allege "incompetency, neglect of duty or malfeasance" in order to remove an appointed official.  Those drafting this amendment observed that "the existing bases for removal forced previous governors to develop a case against an appointee in order to remove the person from office."  They explained that "[a] governor must have the power to remove appointees without fear

24

> of prolonged legal challenges to the removal and the media
> exposure that goes along with these public dismissals."

*Id.* at 66 (internal citations omitted).  The New Mexico Supreme Court further held that "[t]he removal authority [under article V, section 5 of the state constitution] applies indiscriminately to all gubernatorial appointees."  *Id.*  The New Mexico Supreme Court reasoned that the legislature could have exercised its authority to expressly limit the governor's removal power but did not do so.  The New Mexico Supreme Court declined to overstep its bounds by imposing limits on the governor's removal power where the legislature imposed none.  *Id.* at 67.

*Espinosa*, along with *Ulrick* and *Anaya*, confirms the extent of the governor's broad removal authority.  Moreover, *Espinosa* instructs that this practice has been going on for years – new governors typically remove the previous incumbent's appointees and replace them with new appointees.  All of these New Mexico Supreme Court decisions support a conclusion that Governor Martinez had the authority to remove Plaintiff before his five-year term expired, without any notice or hearing.  The rulings further support a finding that Plaintiff did not have a "legitimate" claim or expectation of continued employment throughout the end of his five-year term.  *Compare Am. Fed. of State, County and Mun. Emp. v. Martinez*, 150 N.M. 132 (2011) (governor's removal of Public Employee Labor Relations Board members violated separation of powers, and due process concerns prohibited governor's authority to remove members; however, the facts were distinguishable where there was a need for continuity and balance on a neutral board and the governor did not have absolute power to appoint any person to that board).

In *Mitchell*, the Tenth Circuit Court applied New Mexico law and reached a conclusion similar to the holdings in *Ulrick*, *Anaya*, and *Espinosa*.  Like Plaintiff, Mitchell, a member of the Museum's Board of Regents, was appointed to a statutory six-year term of employment by

Governor Bruce King.[8] *Mitchell*, 537 F.2d at 386-37. Mitchell asserted that board members served independently and "not at the pleasure of the governor." *Id.* Mitchell apparently disagreed with Governor King as to who should be the board's president, precipitating Governor King's request for Mitchell's resignation before the expiration of his six-year term. Mitchell claimed he was singled out for removal only after he exercised his right of free speech regarding the election of the board president. *Id.* at 387. He alleged that his removal deprived him of property and liberty rights without due process and that he was removed in retaliation for exercising his right of free speech. *Id.* at 387-88. The district court granted defendants' motion to dismiss, finding that Mitchell had no protected property right by virtue of article V, section 5 of the state constitution and the *Ulrick* decision. *Id.* at 388.

The Tenth Circuit Court affirmed, further finding that the museum board member position required policymaking responsibilities, and that the governor could rely on his appointee to display political or personal loyalty. *Id.* The governor had the "unquestionable right of removal" as supported by the provisions of article V, section 5 of the state constitution. Policymaking officials like Mitchell could be removed for political reasons, without notice or hearing. *Id.* at 391.

Based on the pertinent statutory and constitutional language, along with numerous case decisions, the Court concludes that Plaintiff failed to raise a genuine issue of material fact for trial to show that he had a property interest or a legitimate expectation in his continued employment through the end of his five-year term. He also failed to create a genuine issue of material disputed fact regarding a requirement that he be given certain due process before being

---

[8] Unlike Plaintiff, Mitchell served without compensation. However, similar to Plaintiff, Mitchell was exempt from the state's civil service system and exercised broad policymaking powers in his position. *Id.* at 390.

removed from his position.  Because the Court concludes that it is undisputed that Plaintiff did not have a property interest or right to due process before removal, summary judgment will be granted in favor of Defendants as to the due process and takings claims (Counts II and III).

### 3.       Breach of Contract Claim

Plaintiff alleges that the State of New Mexico breached an employment contract for a term of years when Governor Martinez removed him one year before the expiration of the statutory five-year term.  (Complaint; Response at 2.)  As previously discussed, Plaintiff relies solely on the statutory term of employment as evidence of an employment contract.  There were no terms of employment negotiated by the parties that were set out in a written document.  There were no policies, manuals, handbooks, verbal representations, or course of conduct that might be evidence of an implied contract

Plaintiff provided no legal authority, nor did the Court locate any, for the proposition that a statutory term of employment creates a written employment contract between a governing entity and the appointee.  As stated above, Plaintiff relied on state case law discussing implied employment contracts that is inapposite as there is no evidence of an implied-in-fact contract.

The Court concludes that a statutory term of employment does not constitute and is not evidence of an employment contract.  In *Dodge v. Bd. of Educ.*, 302 U.S. 74 (1937), the Supreme Court discussed whether contracts could be created by statutes.  The *Dodge* Court noted the parties' agreement that legislation merely declared a "state policy" and directed "a subordinate body to carry it into effect."  Such policy was subject to revision or repeal by the legislature.  *Id.* at 78.

If, however, a statute required the execution of a separate written contract on behalf of the state, "the case for an obligation binding upon the state is clear."  *Id.*  The *Dodge* Court found

that "an act merely fixing salaries of officers creates no contract in their favor, and the compensation named may be altered at the will of the Legislature." *Id.* at 78-79 (citations omitted).

The Supreme Court further clarified that this was "true also of an act fixing the term or tenure of a public officer or an employee of a state agency. *The presumption is that such a law is not intended to create private contractual or vested rights, but merely declares a policy to be pursued until the Legislature shall ordain otherwise." Id.* at 79 (emphasis added) (citations omitted). The party asserting the creation of a contract with a state, based on statutory provisions, bears the burden of overcoming the presumption. *Id.*

Consistent with *Dodge*, the New Mexico Supreme Court, in *Espinosa*, observed that "[w]hile the policies underlying staggered terms [of employment] are important, such *policies* cannot override the Governor's express removal authority." *Espinosa*, 134 N.M. at 65 (emphasis added). In other words, statutory terms arise from policy concerns. A statutory term of years of employment is not the result of a meeting of the minds where an employee and employer negotiate the terms of a contract. Stated differently, Plaintiff did not satisfy his burden of overcoming the presumption that the statute in question was not intended to create a private contractual right.

Moreover, Plaintiff failed to show the Court that he was not an at will employee. Tenth Circuit case law "broadly stat[es] that absent specific contractual arrangements to the contrary, 'public employees are employed at will.'" *Trant v. Oklahoma,* 426 F. App'x 653, 663 n.3 (10th Cir. June 15, 2011) (unpublished) (*citing Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987, 990 (10th Cir. 1996)). There is no specific "contractual arrangement," other than the five-year statutory term.

The parties presented evidence demonstrating that Plaintiff was informed of his at will status.  Plaintiff signed an acknowledgement that he received State policies stating that exempt officers, like Plaintiff, were at will employees.  (Motion, Ex. 2.)  Plaintiff attached to his affidavit email messages communicating that the contents of the emails did not alter his status as an "exempt 'at-will' employee."  (Affidavit, Ex. G.)

In addition, Plaintiff asserted the breach of contract claim solely against the State.  Defendants rely on NMSA 1978 § 37-1-23(A), which states:  "Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract."  It defies credulity to conclude that governmental immunity would be avoided based on nothing more than statutory language setting a term of employment.  There is no valid written contract.  However, even if there were a dispute concerning the existence of a written contract, the Court finds no evidence of a breach of that contract based on Governor Martinez's unlimited removal authority, as discussed above.

The Court concludes, therefore, that Plaintiff failed to raise a genuine issue of material fact for trial with respect to the existence of a valid employment contract or a breach of an alleged contract.  Therefore, the Court will grant summary judgment in favor of Defendants on the contract claim (Count V).

### 4.	Inverse Condemnation Claim

Plaintiff's inverse condemnation claim relies on § 42A-1-29 that states:

> A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation or without instituting and prosecuting to final judgment in a court of competent jurisdiction any proceeding for condemnation is liable to the condemnee, or any subsequent grantee thereof, for the value thereof or the damage thereto at the time the property is or was

> taken or damaged, with ten percent per year interest, to the date
> such just compensation is made, in an action to be brought under
> and governed by the Rules of Civil Procedure for the District
> Courts of this state. Actions under this section shall be brought in
> the county where the land or any portion thereof is located.

NMSA 1978 § 42A-1-29(A).  As the statute makes clear, it provides a cause of action relating to

damage to real property or land.  Nothing in the statute refers to employment rights, nor did

Plaintiff present any pertinent case law to support such a position.  Moreover, even if the statute

could be read so broadly as to encompass the right to continue in a job for the full statutory

period, the Court already determined Plaintiff failed to present genuine issues of material fact

with respect to a protected property interest in his position.  Therefore, the Court will grant

Defendants summary judgment on the inverse condemnation claim (Count IV).

**B.**      **Qualified Immunity Defense**

"The doctrine of qualified immunity protects government officials from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (internal quotation marks omitted).  "Qualified immunity gives government officials

breathing room to make reasonable but mistaken judgments, and protects all but the plainly

incompetent or those who knowingly violate the law."  *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013)

(*per curiam*) (internal quotation marks omitted).

The Tenth Circuit Court of Appeals reviews summary judgments based on qualified

immunity differently than other summary judgments.  *Panagoulakos v. Yazzie,* __ F.3d __, 2013

WL 6698134, at *3 (10th Cir. Dec. 20, 2013).  When a defendant asserts qualified immunity at

summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a

constitutional right and (2) the constitutional right was clearly established."  *Courtney v. Okla. ex*

*rel., Dep't of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013) (internal quotation marks omitted).  If the plaintiff meets this two-part test, the defendant bears the traditional burden of the movant for summary judgment, *i.e.,* showing that no genuine issues of material fact exist to preclude summary judgment.  *Clark v. Edmunds,* 513 F.3d 1219, 1222 (10th Cir. 2008) (citations omitted).  The Court may address either prong of the qualified immunity analysis first.  *Courtney*, 722 F.3d at 1222.

Although the summary judgment rulings (*see supra*) dispose of all claims set out in the Complaint, the Court also addresses Governor Martinez's assertion of qualified immunity with respect to Counts I, II, and III of the Complaint.  The Court concludes that Governor Martinez is entitled to qualified immunity as to the claims brought under the First Amendment, Fourteenth Amendment, and the Takings Clause.

### 1.    First Amendment Claim

There is clearly established law that "[t]he First Amendment protects public employees from discrimination based upon their political beliefs, affiliation, or non-affiliation unless their work requires political allegiance."  *Mason*, 115 F.3d at 1451.  *See also Gann v. Cline*, 519 F.3d 1090, 1095 (10th Cir. 2008) ("[C]onditioning hiring decisions on political belief and association plainly constitutes an unconstitutional condition, unless the government has a vital interest in doing so.") (internal citation omitted).

There are three reasons, however, to support a finding that Governor Martinez did not violate that right:  (1) the WCA Director's work required political allegiance; and (2) the New Mexico State Constitution expressly provides the governor with plenary authority to remove the WCA Director; and (3) New Mexico courts have consistently upheld the removal of state officials with policymaking authority.  The Court will not repeat its reasoning for these findings

that are fully explained above.  Because Plaintiff did not raise a genuine issue of material fact regarding the violation of a clearly established right, Governor Martinez is entitled to qualified immunity.

There is an alternative ground to warrant qualified immunity protection for Governor Martinez's actions.  In *Mimics, Inc. v. Vill. of Angel Fire*, 394 F.3d 836, 842 (10th Cir. 2005), the Tenth Circuit Court noted that qualified immunity is appropriate even where the law was clearly established at the time of the challenged conduct if there were "extraordinary circumstances." Such extraordinary circumstances that might render an official's conduct objectively reasonable include reliance on a state statute or regulation.  "This exception points towards the heavy burden put upon a plaintiff attempting to overcome a qualified immunity defense." *Copar Pumice Co., Inc. v. Morris*, 2009 WL 1563515, *8 (D.N.M. May 11, 2009) (unpublished).

The Court concludes that qualified immunity protects Governor Martinez based on her objectively reasonable reliance on the State Constitution, article V, section 5 and numerous state court rulings authorizing her removal power.  A number of decisions by New Mexico state courts confirmed the extent of a governor's removal authority under the state constitution and sanctioned this same type of political patronage removal.  While reliance on a constitutional provision or statute does not necessarily make an official's conduct per se reasonable, it is "one factor to consider in determining whether the officer's actions were objectively reasonable, keeping in mind that the overarching inquiry is one of fair notice." *See Roska v. Peterson*, 328 F.3d 1230, 1252, 1253 (10th Cir. 2003) (citations and quotation omitted).  Stated differently, reliance on well-established authority weighs in favor of the conclusion that a reasonable official would find that removal of Plaintiff was constitutional.

Alternatively, because Governor Martinez's reliance on state constitutional authority and state law for Plaintiff's removal was objectively reasonable, there are no genuine facts in dispute to show a violation of Plaintiff's First Amendment rights. Thus, the Court concludes that Governor Martinez is entitled to qualified immunity on the First Amendment claim (Count I).

### 2.        Due Process and Taking Claims

The Fourteenth Amendment prohibits a state from depriving a person of "property, without due process of law." U.S. Const. amend. IXV, § 1. Thus, there is clearly established law that if a plaintiff proves he has a property interest in his employment, a state cannot deprive him of that interest without due process.

As explained fully above, Plaintiff failed to raise a genuine issue of material fact with respect to having a legitimate expectation of continued employment through his full five-year term. In other words, Plaintiff did not present evidence sufficient to show he had a protected property interest in his continued employment. Thus, without a protected property interest, there could be no violation of his due process rights and no governmental taking of such alleged property.

Plaintiff failed to raise a genuine issue of material fact with respect to alleged violations of the Fourteenth Amendment or the Takings Clause. Therefore, summary judgment is granted in favor of Governor Martinez, based on qualified immunity, as to both claims (Counts II and III).

## CONCLUSION

Defendants are entitled to summary judgment on all of Plaintiff's claims (Counts I-V) and, in addition, Governor Martinez is entitled to qualified immunity on the first three claims

(Counts I, II, and III).  Therefore, Plaintiff's Complaint in its entirety will be dismissed with prejudice.

IT ISTHEREFORE ORDERED that DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL OF PLAINTIFF'S CLAIMS AND/OR FOR QUALIFIED IMMUNITY (Doc. No. 24) is GRANTED, with the result that Plaintiff's COMPLAINT FOR VIOLATION OF FEDERAL AND STATE CONSTITUTIONAL RIGHTS, BREACH OF CONTRACT, AND INVERSE CONDEMNATION will be dismissed, with prejudice.

_____
SENIOR UNITED STATES DISTRICT JUDGE